### 37727. McCAFFERTY et al. v. MEDICAL COLLEGE OF GEORGIA et al.

HILL, Presiding Justice.

According to the complaint, Jessica McCafferty was born two months prematurely on April 6, 1979, at a private hospital in Augusta. Because of a possible abdominal obstruction she was transferred the next day to Eugene Talmadge Memorial Hospital as a paying patient. At Talmadge Memorial she was placed in neonatal intensive care and given normal saline solutions intravenously until she would be able to undergo abdominal surgery. On April 14, 1979, a concentrated intravenous saline solution, inappropriate for direct administration without dilution, allegedly was injected into the infant by hospital personnel.

When her parents saw her, they found that Jessica's fontanel (the soft spot in an infant's head) was greatly depressed. She had become severely dehydrated because of the abnormal amount of salts administered to her and, as a result, she suffered from electrolyte imbalance and intracranial hemorrhaging. Thus the child's physical and mental development were retarded and she is partially blind and suffers from seizures. The complaint alleges that she is permanently disabled and lacks the ability to control her movements and bodily functions.

Jessica and her parents sued the Medical College of Georgia, the Board of Regents of the University System of Georgia and the Regents of the University System of Georgia because the hospital at which the alleged malpractice occurred is the teaching hospital of the Medical College, a branch of the University System of Georgia governed by the Board of Regents. See Code Ann. § 32-103. Jessica's

mother, as next friend, seeks damages for her permanent injuries and the parents seek to recoup their medical expenses alleged to exceed $19,000.[1]

By motion to dismiss, all three defendants raised sovereign immunity as a defense. The trial court granted their motion, leading to this appeal by the McCaffertys. The defendants rely upon Ga. L. 1976, p. 452; Code Ann. § 32-101.1, defining and reaffirming the applicability of the doctrine of sovereign immunity to the Board of Regents of the University System of Georgia. The McCaffertys challenge the constitutionality of the 1976 act under the 1945 and 1976 Constitutions. They also challenge the constitutionality of the 1976 act and the doctrine of sovereign immunity itself under the due process and equal protection provisions of the Georgia and U. S. Constitutions.

1. Enumerations of error 1 and 3 raise the issue of sovereign immunity as to the Medical College and the Board of Regents, respectively. The Eugene Talmadge Memorial Hospital, where the injury occurred, was established by the Board of Regents under the authority of Ga. L. 1945, p. 453, as amended, Ga. L. 1953, p. 117: "The Board of Regents of the University System of Georgia in the exercise of its public and governmental functions shall have power and is hereby authorized to lease, buy, build, construct, establish, contract for the use of, maintain and operate a general non-profit teaching hospital at Augusta, Georgia, which said hospital may be that hospital known as the Eugene Talmadge Memorial Hospital now under construction, to be operated in conjunction with the Medical College of Georgia for the benefit of indigent, near indigent and pay patients. . . ." Id. at pp. 117, 118. Thus, since the Eugene Talmadge Memorial Hospital is run in conjunction with the Medical College, which is a branch of the University System of Georgia, governed by the Board of Regents, the defendants contend that Ga. L. 1976, p. 452, granting sovereign immunity to the Regents and Board of Regents, controls this litigation. We must first examine the history of the Medical College of Georgia to determine whether the 1976 act also applies to the Medical College of Georgia.

The Medical College of Georgia was founded by an 1828 act creating "a body corporate, by the name and style of the trustees of the Medical Academy of Georgia." Ga. L. 1828, p. 111.[2] The trustees

---

[1] The allegations of the complaint are accepted as true only for the purpose of deciding this appeal.

[2] The name was changed to the Medical Institute of the State of Georgia by Ga. L. 1829, p. 107, and to the Medical College of Georgia by Ga. L. 1833, p. 130.

were authorized to establish a medical school and had the authority "by their corporate name, to sue and be sued, plead and be impleaded, answer and be answered unto, in any court of law or equity. . . ." In the 1895 Code the Medical College and several other colleges were designated "branches of the University of Georgia . . . governed in the manner prescribed in the respective acts incorporating the same." 1895 Political Code § 1300.

The Court of Appeals, in *Medical College of Ga. v. Rushing,* 1 Ga. App. 468 (57 SE 1083) (1907), recognized that the Medical College was originally established as a corporate body capable of suing and being sued, and held that it did not become immune from malpractice suits when it was designated a branch of the University of Georgia under § 1300 of the 1895 Political Code. The court relied on the facts that the Medical College was originally authorized "to sue and be sued, plead and be impleaded, answer and be answered unto, in any court of law or equity" and the General Assembly, when it made the Medical College a branch of the University of Georgia, had declared that the branches would be "governed in the manner prescribed in the respective acts incorporating the same." 1 Ga. App. at 470-471. It thus held that the Medical College did not have immunity from suit.

The legislature in 1911, however, provided "that from and after the passage of this Act, the Medical College of Georgia, located at Augusta, Georgia, and designated in the Civil Code of Georgia as one of the branch colleges of the University of Georgia, shall be under the management and control of a Board of Directors composed of nine members, appointed as hereinafter provided, subject, however, to the control of the Board of Trustees of the University of Georgia." Ga. L. 1911, p. 154 at § 1. The act also provided for the transfer of the property of the Medical College to the Trustees of the University of Georgia, Ga. L. 1911, p. 154, 156 at §§ 4, 5, and provided that the Trustees of the University of Georgia not be responsible for the debts, contracts or liabilities of the Medical College greater than the extent of the property transferred. Ga. L. 1911, pp. 154, 157 at § 6.

In 1931, as part of the reorganization of that year, the General Assembly created the Board of Regents of the University System of Georgia to govern the University of Georgia and all its branches, including the Medical College at Augusta. Ga. L. 1931, pp. 7, 20; Code Ann. §§ 32-101 through 32-103. The members of the Board of Regents were appointed by the Governor who was an ex-officio member, Ga. L. 1931 at pp. 21-22. The Board was "vested with all the powers, privileges, and rights vested in former Boards of Trustees of the University of Georgia, and all former boards of trustees or directors of

its branches . . . and they are charged with all of the duties, obligations, and responsibilities incumbent upon and/or pertaining to said former boards." Ga. L. 1931 at p. 23. The Board of Regents acquired all of the powers, rights, privileges and duties of the Board of Trustees of the University of Georgia, Ga. L. 1931 at p. 25; Code Ann. § 32-112, and of the boards of trustees and directors of the branches of the University. Ga. L. 1931 at p. 26; Code Ann. § 32-128. All existing laws pertaining to the Board of Trustees of the University of Georgia and all laws pertaining to the trustees and directors of its branches, except those repealed expressly or by implication, were made applicable to the Board of Regents. Ga. L. 1931 at pp. 25, 26; see Code Ann. § 32-114. The act provided further that "The said Board of Regents shall carry out the purposes and intent of the various Acts creating the [branches], it not being the intent of this Act to repeal any of the laws creating said institutions or defining their functions, but merely to abolish the separate Boards of Trustees or Directors of said institutions and place the management and control of said institutions in one Board with all the powers formerly vested in the several Boards of Trustees or Directors except such powers and duties expressly or by implication repealed." Ga. L. 1931 at pp. 27-28. Finally, the act expressly repealed certain prior acts, including specified sections of the act of 1911, but it did not expressly repeal those parts of the 1911 act quoted above, Ga. L. 1931 at p. 28.

One of the powers thereby assumed by the Board of Regents was the power "to sue and be sued, plead and be impleaded, answer and be answered unto," belonging to the Trustees of the Medical College of Georgia. Here, then, the history of the Medical College merges with that of the Board of Regents. Thus, we agree with the defendants that the power to sue and be sued which originally resided in the Medical College has been taken from that college and vested in the Board of Regents. The trial court did not err in dismissing the Medical College of Georgia as a defendant.

In *Busbee v. Ga. Conference, Am. Assn. of University Professors,* 235 Ga. 752, 754 (221 SE2d 437) (1975), we traced the history of the Trustees of the University of Georgia from its creation in 1785 into the Board of Regents. The creating act declared the Trustees to be " 'a person in law, capable to plead and be impleaded, defend and be defended, answer and be answered unto.' " Ga. L. 1785, p. 560, § 3; Cobb's Digest, p. 1084 (1851). The status of the Trustees of the University of Georgia as a "person in law, able to plead and be impleaded" was continued in the Code of 1863 (§ 1117), and the Codes of 1868 (§ 1198), 1873 (§ 1193), 1882 (§ 1193), 1895 (§ 1272), and 1910 (§ 1364). We found that upon the reorganization act of 1931, the

Board of Regents succeeded to all the powers and duties of, and the laws applicable to, the Trustees of the University of Georgia, and we held that, in view of the express waiver of sovereign immunity, the Board of Regents could be sued. (235 Ga. at 758-759).[3]

The defendants rely upon Ga. L. 1976, p. 452, Code Ann. § 32-101.1 (1), which was enacted in response to *Busbee* and which provides: "Section 1. The applicability of the doctrine of 'sovereign immunity' to the Board of Regents of the University System of Georgia is hereby reaffirmed, except to the extent that the General Assembly of Georgia may hereafter expressly provide. As used in this Act, the term 'Board of Regents of the University System of Georgia' shall include the 'Regents of the University System of Georgia.'" In section 2 of the act, the General Assembly expressly repealed so much of the 1785 act as provided that the Trustees of the University of Georgia "shall and may be a person in law, capable to plead and be impleaded, defend and be defended, answer and be answered unto."

The defendants contend that, at least since 1976, the Board of Regents and the Regents of the University System have enjoyed sovereign immunity. The McCaffertys, however, point out that after 1931, the statutory powers and duties of the Board of Regents were elevated to constitutional status and that, therefore, the General Assembly lacks the authority to abrogate any of these powers and duties including the power to sue and be sued.[4]

Understanding of this constitutional argument requires a brief review of the Cocking Case. At its June, 1941, meeting the Board of Regents voted 8 to 7 to reinstate Walter D. Cocking as Dean of the College of Education at the University of Georgia notwithstanding charges that he advocated the establishment of a student practice school where white and black students would be taught together. Then Governor Eugene Talmadge, ex-officio member of the Board of

---

[3] The 1935 act, Ga. L. 1935, pp. 171, 172, enacted in response to the Regents' efforts to issue bonds, see *State of Ga. v. Regents, University System,* 179 Ga. 210, 222 (175 SE 567) (1934), provided as to the Board of Regents only that its members were public officers and subject to the limitations and restrictions imposed by the Constitution and laws upon other public officers. The 1935 act applied only to the members of the Board of Regents and did not repeal by implication the power of the Board of Regents as an entity to sue and be sued. See *Busbee,* supra, 235 Ga. at 757. The 1935 act was repealed in 1946. Ga. L. 1946, p. 218. See also *First Dist. Agricultural &c. School v. Reynolds,* 11 Ga. App. 650 (75 SE 1060) (1912); *Knowles v. Housing Authority of Columbus,* 212 Ga. 729 (95 SE2d 659) (1956).

[4] The McCaffertys also argue that since the Board of Regents did not have sovereign immunity in 1975, *Busbee,* supra, the 1976 act "reaffirmed" nothing.

Regents, called for another meeting in July.[5] In the intervening month the Governor asked for and received the resignations of at least two Regents and appointed their successors. At the July meeting, Dean Cocking was dismissed by a vote of 10 to 5. The Committee of the Southern Association of Colleges and Secondary Schools recommended that 10 schools (branches) including the University of Georgia be dropped from membership in the Association after finding among other things that the University System of Georgia had been the victim of "unprecedented and unjustifiable political interference." See Brooks, The University of Georgia Under Sixteen Administrations, pp. 186-194 (1956).

Ellis Arnall defeated Eugene Talmadge in the governor's race in 1942. At the 1943 session of the General Assembly one bill and one resolution proposing a constitutional amendment regarding the Board of Regents were passed. The 1943 act abolished the existing Board of Regents and created a new Board of Regents with all the powers and duties of the old Board. Ga. L. 1943, p. 670. The 1943 constitutional amendment provided that "The said Board of Regents of the University System of Georgia shall have the powers and duties as provided by law existing at the time of the adoption of this amendment, together with such further powers and duties as may be hereafter provided by law." Ga. L. 1943, p. 66. Thus in 1943 the Board of Regents became a constitutional body with its statutory powers and duties protected by the constitution.

Shortly thereafter, when the 1945 Constitution was ratified, the 1943 amendment was included, as follows: "The said Board of Regents of the University System of Georgia shall have the powers and duties as provided by law existing at the time of the adoption of this Constitution, together with such further powers and duties as may be hereafter provided by law." 1945 Ga. Const., Art. VIII, Sec. IV, Par. I; Code Ann. § 2-6701.

The phrase "such further powers and duties as may now or hereafter be provided by law" is strikingly different from the phrases "as provided by law," "unless otherwise provided by law" and "except as provided by law."

When the Constitutional Commission met in April, 1944, Governor Arnall, Chairman of the Commission, referred to the 1943 constitutional amendment and the independent constitutional Board of Regents, saying: "That means that no matter who comprises

---

[5] It may be interesting to note that Jessica McCafferty was hospitalized at the Eugene Talmadge Memorial Hospital when the undiluted saline solution allegedly was administered to her.

the General Assembly of this State or who is occupying the office of Governor, the Regents as a department continues to function completely protected from the whims and caprices of politics." Records of the Constitutional Commission, Vol. 1, p. 200. The 1943 amendment was included in the 1945 Constitution without material change. When the provision was voted upon by the Constitutional Commission, Mr. Thrasher asked why there was a constitutional provision for the State School Superintendent but not for the Chancellor of the University System. He received the following answer:

"Mr. Gross. We do not provide for the Chancellor of the University System in the Constitution at the present time. It is provided by statute, and—

"Mr. Harris. It is frozen in here then.

"Chairman Arnall. If it is by statute it is now frozen." (Records of Constitutional Commission, Vol. 2, p. 70).

This section of the Constitution was substantially reenacted in the 1976 Constitution: "The said Board of Regents of the University System of Georgia shall have the powers and duties as provided by law existing at the time of the adoption of the Constitution of 1945, together with such further powers and duties as may now or hereafter be provided by law." 1976 Ga. Const., Art. VIII, Sec. IV, Par. I; Code Ann. § 2-5201. Since it is clear that the power to sue and be sued existed in the Board of Regents at the time of the adoption of the 1943 amendment and the 1945 Constitution and was reenacted as part of the 1976 Constitution, the 1976 act attempting to provide sovereign immunity for the Board of Regents is in direct conflict with our Constitution. We therefore find that, as to the Board of Regents, Ga. L. 1976, p. 452; Code Ann. § 32-101.1, is an attempt to diminish the powers and duties of the Board of Regents contrary to the Constitution and in no way prevents the Board of Regents from suing to protect its other powers and duties or from being sued.[6]

The State Court of Claims amendment to the Constitution (Ga. L. 1973, p. 1489) is inapplicable here because it reserved sovereign immunity except to the extent of any waiver of immunity provided by

---

[6] Anything to the contrary in *C. F. I. Const. Co. v. Board of Regents of University System*, 145 Ga. App. 471 (2), cert. dismissed, 242 Ga. 96 (1978) (wherein this argument was not raised); *Azizi v. Board of Regents of University System*, 132 Ga. App. 384 (208 SE2d 153) (1974), cert. dismissed, 233 Ga. 487 (1975); and in *Perry v. Regents of University System*, 127 Ga. App. 42 (192 SE2d 518) (1972), will not be followed.

the Constitution or by law.[7] *Busbee,* supra, 235 Ga. at p. 758.

The powers and duties of the Board of Regents as they existed in 1943 are preserved in the Constitution, and include the power to sue and be sued. On the other hand, the similar power of the Medical College to sue and be sued was transferred to the Board of Regents in 1931 and leaves the Medical College without the power to sue and be sued. We thus hold that the trial court erred in granting the motion to dismiss by the Board of Regents but did not err in dismissing the Medical College of Georgia.

2. Enumeration of error 2 raises the question of the sovereign immunity of the Regents of the University System of Georgia. Although the Regents is a corporate body, established by Ga. L. 1931, p. 20; Code Ann. § 32-101, neither that act nor any following it have granted the corporation any power to sue or be sued. Regents is therefore immune from suit under Ga. L. 1976, p. 452; Code Ann. § 32-101.1, since the powers and duties of the corporation have not been raised to constitutional status. Therefore, the trial court did not err in dismissing Regents as a defendant.

Since we have held that the trial court improperly dismissed the Board of Regents, the plaintiffs are not deprived of their right to recover in violation of the equal protection and due process provisions of the U. S. Constitution and we need not reach the remaining enumerations of error.

*Judgment affirmed in part; reversed in part. All the Justices concur, except Gregory, J., who concurs specially, and Jordan C. J., Marshall and Weltner, JJ., who dissent.*

DECIDED FEBRUARY 4, 1982 —
REHEARING DENIED FEBRUARY 23, 1982.

*Burnside & Wall, James B. Wall, Thomas R. Burnside, Jr.,* for appellant.

*Michael J. Bowers, Attorney General, Patrick W. McKee, Staff Assistant Attorney General,* for appellees.

*Don C. Keenan, James E. Butler, Jr., E. Marcus Davis, William F. Braziel, Jr., Charles H. Ivy, Arlene L. Coleman, Cynthia J. Ringo,* amici curiae.

James T. Cook, amicus curiae.

---

[7] Amicus James T. Cook raises the invalidity of this constitutional amendment because of improper advertising. However, inasmuch as we hold that this amendment is inapplicable here and because he has raised that issue in a pending case, we do not reach the merits of his argument.

GREGORY, Justice, concurring specially.

The majority opinion holds that the use of the words "sue and be sued" in relationship to the powers of the bodies involved is a waiver of sovereign immunity. I am not persuaded that these words should now be given that interpretation. This is particularly so in view of the specific power placed in the General Assembly concerning waiver of sovereign immunity contained in the State Court of Claims amendment to the Constitution (Ga. L. 1973, p. 1489). It may be that these words do not relate at all to the doctrine of sovereign immunity. They can be construed to merely describe the nature of the entity in question as one to be recognized as capable of coming into and being brought into our courts as a party, much as the phrase is used regarding individuals and corporations in Code Ann. § 81A-117(b). If the General Assembly wishes to exercise its power to waive sovereign immunity, it should be expressed in clear unambiguous language so that this court is left with no doubts as to the intention of the General Assembly. However, regardless of the interpretation we might now place on these words, it is clear that our courts have in the past given them the meaning the majority opinion now gives them. *First Dist. Agricultural &c. School v. Reynolds,* 11 Ga. App. 650 (75 SE 1060) (1912). It is this interpretation of these words which was incorporated into the Constitution of 1945. A constitutional provision is to be construed in the sense in which it was understood by the framers and the people at the time of its adoption. *Collins v. Mills,* 198 Ga. 18 (1) (30 SE2d 866) (1944). Where the language in our constitution does not indicate an intention to declare some new principle, sound construction requires that it be construed to have intended no more than merely to state the law as it existed at that time. *Griffin v. Vandergriff,* 205 Ga. 288 (1) (53 SE2d 345) (1949). The interpretation we might give these words today is unimportant. Only that interpretation incorporated into the Constitution concerns us in this particular case. The waiver of sovereign immunity was incorporated into the Constitution.

JORDAN, Chief Justice, dissenting.

The lawsuit arose from alleged negligence on the part of the Medical College of Georgia in treating a one-day-old premature child. Plaintiffs brought suit against the Hospital, the Board of Regents of the University System of Georgia, and the Regents of the University System of Georgia. The trial court granted the defendants' motion to dismiss for failure to state a claim, based upon the doctrine of sovereign immunity.

The majority opinion holds that the trial court correctly dismissed the claim against the Medical College of Georgia and the

Regents of the University System of Georgia, but erred in dismissing the Board of Regents of the University System of Georgia on the ground that the Board is not immune to the suit. In trying to understand the circuitous reasoning of the majority opinion, I am reminded of the nursery rhyme "Here we go round the mulberry bush, the mulberry bush, so early in the morning (new year)." One has only to read the recent opinions of this Court in *Busbee v. Ga. Conference, Am. Assn. of Univ. Professors,* 235 Ga. 752 (221 SE2d 437) (1975) (Jordan and Hall, dissenting); *Azizi v. Bd. of Regents of University System,* 233 Ga. 487 (212 SE2d 627) (1975), (Nichols, dissenting), plus the other authorities cited in the well-prepared briefs of the parties and amicus, to recognize the mishmash which we have gotten into regarding the doctrine of sovereign immunity.

How to treat this doctrine and its inequitable problems has plagued this Court for generations. In many opinions of this Court and the Court of Appeals it was pointed out that the doctrine was outmoded and unreasonable. While judicially created, and therefore subject to judicial abrogation, the Courts importuned the General Assembly, as the policy-making body of State government, to take the necessary corrective action.

The General Assembly responded in 1973 by proposing a constitutional amendment which was ratified by the people in 1974. This amendment authorized the General Assembly to create a Court of Claims to dispose of claims against the State and its agencies involving injury (tort) or damage (contract). As to the doctrine of sovereign immunity, the amendment provided that it "is expressly reserved" unless there was a constitutional or statutory waiver. Code Ann. § 2-3401.

It was hoped that this action by the General Assembly and the people settled the matter once and for all.

However, questions concerning the doctrine continued to arise and the matter was once again before this court. In "reassessing the rule of immunity" after the adoption of this amendment, this Court clearly held that the doctrine was now a part of our Constitution, that it could not be abrogated or modified by the Court, and that "solutions to the inequitable problems that it has posed and continues to pose must now be effected by the General Assembly." *Azizi,* supra.

This simple and erudite construction of the 1974 amendment was adhered to in *Revels v. Tift County,* 235 Ga. 333 (219 SE2d 445) (1975) and other cases. It thus appeared that the doctrine was constitutionally alive and vibrant, (subject to the right of the General Assembly to create a Court of Claims to handle claims against the

state and its agencies), and that it could only be waived by express constitutional or statutory action.

The General Assembly failed to establish such a Court and the question again came back to this Court in *Busbee,* supra. The Board of Regents and other officials had been sued to enforce its contracts with its teachers. The majority of this Court, taking what former Justice Hall called "a formalistic canter back through the peculiar history of the Board of Regents and embraces what it finds to be talismanic words in the 1785 statute . . .", held that the Board was subject to suit on the contracts because there had been an express waiver of sovereign immunity by the 1785 statute.

Reacting to the *Busbee* decision, the General Assembly in 1976 expressly repealed the Act of 1785 relied upon by the *Busbee* court and made clear its intention that the Board of Regents was clothed with immunity from suit. Ga. L. 1976, p. 452 (Code Ann. § 32-101.1). Nothing in the 1976 Constitution conflicts with this clear expression of legislative intent.

However, the ghost of Banquo will not down. The question arises again, in this case, on a tort action against the Board of Regents. Now the Court reasons that a 1943 amendment to the Constitution gave constitutional status to the powers and duties of the Board, including the right to sue and be sued, that this provision was carried forward in the 1945 and 1976 Constitutions, thus making the 1976 statute dealing with the sovereign immunity of the Board in conflict with the Constitution.

The words authorizing a state agency to "sue and be sued" cannot be construed as a general waiver of sovereign immunity as to the *State* or any of its *Departments.* This Court clearly so stated in *Tounsel v. State Hwy. Dept. of Ga.,* 180 Ga. 112 (1) (178 SE 285) (1934). This interpretation is true whether the words are used in a Statute or in the Constitution simply because the use of such words alone does not constitute an "express waiver" of immunity. The Board of Regents of the University of Georgia is a *department* of the State of Georgia. Code Ann. § 32-101.

In a long line of cases, and as recently as *Sikes v. Candler County,* 247 Ga. 115 (274 SE2d 464) (1981), this Court has consistently held that "only by the express consent of the State can it be made amenable to suit." *Sikes,* at 117. In an opinion of this Court in which the ink is still wet, authored by Justice Gregory, this Court reiterated the fact that the implied waiver rule has never been adopted by this Court, which "has always required an express waiver." *National Dist. Co. v. DOT,* 248 Ga. 451, 453 (283 SE2d 470) (1981).

We have not located within the Constitution or Acts of the General Assembly any specific authorization for a breach of contract

or tort negligence claim to be maintained against the Board of Regents of the University System of Georgia. To the contrary, the 1974 Amendment to our Constitution expressly reserved and preserved the doctrine of sovereign immunity unless expressly waived by the General Assembly. Instead of waiving this immunity the General Assembly in 1976 made clear its intention that the Board of Regents was clothed with immunity from suit.

The reasoning of this Court in *Busbee* and in the present case makes it clear that a majority of this Court wishes to abolish the doctrine of sovereign immunity as it relates to the Board of Regents as to both contract and tort actions. In my opinion, we have used bad facts in both cases to make bad law.

The people of Georgia are entitled to know whether the doctrine is still viable in Georgia. It either exists or it does not.

We are now holding that sometimes it does, sometimes it does not. Under the majority opinion the doctrine has been eviscerated as to the Board of Regents but is still a viable defense as to other departments of the State. See *National Dist. Co. v. DOT,* supra. One is now entitled to sue the State provided you are injured by the "right" department. This is an anomalous situation which should not exist.

I am in full agreement that a citizen damaged by the sovereign either in tort or contract should have the right to redress. However, as we clearly stated in *Azizi,* the people in 1974 took the matter out of the hands of the Court and placed it in the General Assembly. The General Assembly has refused to take the steps necessary to afford injured citizens the right to be made whole. This Court, in *Busbee* and in this case, is apparently showing its frustration and disappointment over the failure of the General Assembly to act. In so doing we have resorted in both cases to strained reasoning. We are attempting to slay a dragon which is now impervious to the arrows of this Court.

In my opinion the trial court correctly dismissed the petition for failure to state a claim as to any of the defendants.

I am authorized to state that Justice Marshall and Justice Weltner concur in this dissent.

## ON MOTION FOR REHEARING.

On motion for rehearing, the Board of Regents does not disagree that its powers and duties as they existed in 1943 are preserved in the Constitution. The Board does contend that in 1943 it had sovereign immunity because *Tounsel v. State Hwy. Dept.,* 180 Ga. 112 (178 SE 285) (1935), had the effect of overruling *First Dist. Agricultural &c. School v. Reynolds,* 11 Ga. App. 650 (75 SE 1060) (1912), prior to 1943. See also *Medical College of Ga. v. Rushing,* 1 Ga. App. 468 (57

SE 1083) (1907).

*Tounsel* took a Code section applicable to counties (§ 23-1502: "A county is not liable to suit for any cause of action unless made so by statute") and applied it to the Highway Department. In doing so, the court pointed out that the Highway Department was not a body politic or a corporation (180 Ga. at 116), and that the state derived no profit from the Highway Department (180 Ga. 119). The Board of Regents on the other hand charges for its services and, in fact, Jessica McCafferty was a paying patient at Talmadge Memorial Hospital. In *Knowles v. Housing Authority,* 212 Ga. 729, 734 (95 SE2d 659) (1956), this court distinguished *Tounsel,* as we do again today, on the basis that the Highway Department was performing a governmental function for which it made no charge and received no income or revenue.

*Tounsel* did not overrule *First District Agricultural &c. School v. Reynolds* or *Medical College of Ga. v. Rushing,* supra.

*Motion for rehearing denied. All the Justices concur, except Jordan, C. J., Marshall and Weltner, JJ., who dissent.*